## SHARP-BOYLSTON COMPANY *et al. v.* HALDANE.

PER CURIAM. Assuming that the plaintiff, as an attorney at law, had such interest in the subject-matter of the litigation as to authorize him to institute the action, the evidence (consisting of the pleadings and an agreed statement) was insufficient to show that the defendant corporation and its agent were engaged in the practice of law. For this reason the court erred in granting an injunction.

*Judgment reversed. All the Justices concur except Russell, C. J., and Bell, J., who dissent, and Gilbert, J., absent.*

No. 10995. JULY 11, 1936. ADHERED TO ON REHEARING JULY 28, 1936.

*Harold Hirsch, Marion Smith,* and *Ellis & Bell,* for plaintiffs in error.

*Sydney H. Baynes,* contra. *Stephens Mitchell, William K. Meadow, James D. Childs, Robert S. Sams,* and *Madison Richardson,* as amici curiæ.

RUSSELL, Chief Justice, dissenting. Eldon Haldane, a practicing attorney of this State, brought a petition on behalf of himself and other attorneys similarly situated, against Sharp-Boylston Company, a corporation, and J. W. Teepel, to enjoin them from filing suits and engaging in such activities as constitute the practice of law. The defendants demurred on the grounds (1) that the petition set forth no cause of action; and (2) that the petitioner has no interest or right in the matters complained of, and the cause of action, if there be one, exists in the solicitor-general on the relation of the party aggrieved. It was stipulated and admitted that J. W. Teepel, an employee of Sharp-Boylston Company, "had made affidavits for the issuance of distress warrants" in four stated cases in the municipal court of Atlanta, "and

that in each of said cases the plaintiffs were customers or landlords represented by Sharp-Boylston Company as renting agents, and the defendants were tenants in arrears. (a) That Sharp-Boylston Company is a corporation engaged, among other things, in renting and collecting rents on properties for customers, and that Teepel is one of its employees through whom it conducts its business. (b) That when tenants of properties so rented by Sharp-Boylston Company for its customers refuse to pay rent to such an extent that it is necessary for the rental agents to retake possession of the properties, and the tenants refuse to vacate, Sharp-Boylston Company in behalf of its customers and through Teepel has on frequent occasions taken out dispossessory warrants, and, when the rent had been paid thereafter, dismissed the warrants. (c) That in those instances where the tenant paid his rent Teepel instructed the marshal to enter the warrant settled. (d) That Teepel is not an attorney at law and not admitted and licensed to practice law in the courts of this State. (e) That Teepel, in making the affidavits for dispossessory warrants in the municipal court, acted as employee of Sharp-Boylston, and there was no privity of contract between Teepel and the plaintiffs in dispossessory warrants, except that Teepel was the employee and agent of Sharp-Boylston Company, and the plaintiffs in said dispossessory warrants were the customers of Sharp-Boylston Company. (f) That Teepel, as servant or employee of Sharp-Boylston Company, instructed the marshal to dismiss the dispossessory warrants, or enter them as settled, and deposited the court costs in the municipal court in the dispossessory warrants filed by him for and on behalf of the customers of Sharp-Boylston Company." After a hearing the court granted an injunction, adjudging that Teepel was the agent, not of the customers of the defendant corporation, but of the corporation itself, and ordering that the defendants, be temporarily enjoined from filing any dispossessory warrants or other proceedings in court, from the taking down of money and marking cases settled, dismissing cases, paying court costs, or the doing of any other acts for any of the customers or clients of the defendant corporation. Error was assigned on this judgment.

The issues presented by the writ of error in this case may be condensed into two questions: (1) Has the plaintiff, as a duly licensed attorney at law, suing for himself and others similarly

situated, such an interest as to authorize and enable him to maintain this equitable petition? (2) Were the defendants illegally practicing law? The answer to both questions depends on a consideration of what is embraced in the meaning of the term "the practice of law" in this State. For a number of years the General Assembly has prescribed rules regulating the conduct of vocations of various kinds, and thus classified the nature of the franchise under which the law permits them to operate in their respective businesses. Each enactment defines with precision the particular profession, sets up the machinery for determining who may engage in the profession, and prescribes the mode by which one having been admitted may be excluded therefrom. The regulations are found in the Code of 1933: as to architects, chapter 84-3; dentists, chapter 84-7; physicians, chapter 84-9; pharmacists, chapter 84-13; real-estate agents, chapter 84-14. All of these enactments antedated our statutory provisions as to who are lawyers, defining what constitutes the practice of law. The purpose of these and similar acts is obvious. The legislature had in mind that in a complex civilization the general convenience and public safety would be best served by admitting to a particular pursuit only such persons as by prescribed procedure may be able to demonstrate their fitness with respect to training, skill, and character to engage therein, and by the same token to exclude others who have not made proof that they possess the essential requisites. As lawyers are sworn officers of court, who come in contact with all classes of society in the performance of their high duties, and are thus enabled to help or hurt all classes of society, the action of the General Assembly in defining what is included in the practice of law is not only necessarily far-reaching, but very wise. As far back as *State ex rel. Waring* v. *Georgia Medical Society,* 38 *Ga.* 608 (95 Am. D. 408), this court held that the right of a physician to practice his profession in this State was a franchise in which he had a property right; and so far as we are aware this court has never deviated from the principle announced in this case.

The objection made by plaintiffs in error, that a duly licensed attorney, proceeding, as here, in behalf of himself and others similarly situated, has no such interest as to enable him to maintain an equitable action to enjoin those engaged in the unauthorized practice of law, has been before the appellate courts of

several States in cases which we have examined. Fitchette *v.* Taylor, 191 Minn. 582 (254 N. W. 910); Land Title Abstract & Trust Co. *v.* Dworken, 129 Ohio St. 23 (193 N. E. 650); Dworken *v.* Apartment House Owners Association, 38 Ohio App. 265 (176 N. E. 577); Unger *v.* Landlords' Management Corporation, 114 N. J. Eq. 68 (168 Atl. 229); Paul *v.* Stanley, 168 Wash. 371 (12 Pac. (2d) 401). In the Fitchette case, supra, it was said: "Attorneys, as officers of court, exercise a privilege peculiar to themselves and not enjoyed by those outside of the profession. Hence it is in a very real sense a franchise and property right. . . That is enough to show that these plaintiffs, suing not for themselves alone but for the benefit of all the affected members of their profession, are entitled to injunction to prevent the unlawful intrusion into their office and professional field of defendant Taylor. In such a case the extent of the damage to the property right in unimportant. The extent or threat of real damage is enough to warrant relief." It will be observed that the first statement made by the Minnesota Supreme Court coincides with the statement of this court in 38 *Ga.* 608, that the right to practice the learned profession "is a franchise and property right." In Land Title Abstract & Trust Co. *v.* Dworken, supra, it was said: "The right to practice law conferred by the State is a special privilege in the nature of a franchise, and a possessor thereof may be protected by injunction from the invasion of the rights thus vested in him." In Sloan *v.* Mitchell, 113 W. Va. 506 (178 S. E. .800), it was held, as this court held in the *Waring* case, supra, that a licensed physician has a franchise in the nature of a property right to practice his profession, and may sue in equity in behalf of himself and others similarly situated, to enjoin one without a license from engaging in the practice of medicine. Similarly it seems to us, especially in view of the fact that lawyers are officers of court, that one who has a franchise as a licensed practicing lawyer, in the nature of a property right, is entitled to enjoin one without a license from engaging in the practice of the legal profession. See State Bar *v.* Retail Credit Association, 170 Okla. 246 (37 Pac. (2d) 954), where it was held that an incorporated bar association might maintain a bill to enjoin one, not licensed, from engaging in the practice of law; and this although the wrong was one for which the association could

recover no damages. The right to maintain an injunction against one engaged in the unauthorized practice of law is also sustained in Depew v. Wichita Retail Credit Association, 141 Kan. 481 (42 Pac. (2d) 214). In Frost v. Corporation Commission of Oklahoma, 278 U. S. 515 (49 Sup. Ct. 235, 73 L. ed. 483), it was held "that the right to operate a gin and to collect tolls therefor, as provided by the Oklahoma statute, is not a mere license, but a franchise, granted by the State in consideration of the performance of a public service; and as such constitutes a property right within the protection of the 14th amendment."

The General Assemby has provided for tribunals for hearing complaints and trying and disciplining members after a hearing, in the various enactments, as to architects, physicians, dentists, pharmacists, real-estate agents and lawyers, and other provisions from which it must be assumed that those legally authorized to pursue the particular business or profession have such a property right therein that they may not be excluded therefrom except by due process. Upon this point see *Southeastern Electric Co.* v. *Atlanta,* 179 *Ga.* 514 (176 S. E. 400). In this connection it would seem not to be inappropriate to quote the language of Mr. Justice Bradley in the Slaughter House Cases, 16 Wall. 36 (21 L. ed. 394), as follows: "The right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property right." That an injunction is the appropriate remedy for any encroachment on a property right in the nature of a franchise is stated as a fixed principle in 5 Pomeroy's Eq. Jur. § 2016. The fact that the act of 1931 (Code, § 9-401 et seq.), defining the practice of law, makes a crime an encroachment upon this property right in the nature of a franchise does not in anywise affect the right sought to be asserted here. The violation of a public law which may authorize or require punishment for the offense against the public does not preclude the right of the holder of the franchise from protection of his property. The contention of the plaintiffs in error upon this point was rejected in the cases of Fitchette, Dworken, Unger, and Paul, cited supra. Those decisions are merely persuasive authority; but the exact point has been decided by this court in *Jones* v. *Van Winkle Gin & Machine Works,* 131 *Ga.* 336 (62 S. E. 236, 17 L. R. A. (N. S.) 848, 127 Am. St. R.

235), in which it was held: "An injunction may issue in a proper case, to restrain persons from attempting by threats, violence, or intimidation, or other unlawful means, to prevent any person from engaging in, remaining in, or performing the business, labor, or duties of any lawful enterprise or occupation, although the acts sought to be restrained, if committed, constitute a crime." In delivering the unanimous opinion of the court Mr. Presiding Justice Evans said: "But a court of equity is not ousted from the exercise of its peculiar functions of preventing irreparable damage merely because, in exercising such functions, it may also prevent the commission of a crime. The court does not interfere to prevent the commission of crime, although that may incidentally result, but it exerts its force to prevent individual property from destruction, and *ignores entirely the criminal feature of the act.* [Italics ours.] And Mr. Pomeroy (6 Eq. Jur. 619) says that 'it is everywhere the rule, following the general principle in equity, that where there is ground for equitable interference, as, where an irreparable injury is threatened to property, the fact that the act is also a crime is not a reason for refusing an injunction.' This principle was recognized and applied by this court in the case of an indictable nuisance. *Mayor &c. of Columbus* v. *Jaques,* 30 *Ga.* 506. So it is no reply to the invocation of the equitable remedy to prevent irreparable injury to property, that the acts which cause the damage may also be indictable." So I conclude that the plaintiff (defendant in error) was entitled to file this action.

The principal contention of the plaintiffs in error is that the acts performed by them are merely mechanical, and do not in any sense constitute the practice of law. Learned and astute counsel illustrate this proposition by comparison, by saying that if he were to send his office-boy to file a brief with the clerk of this court, it could hardly be said that the office-boy was engaged in the practice of law. Agreeing with learned counsel in his conclusion, we must say that the illustration is not applicable to the facts admitted by the stipulation appearing in the bill of exceptions. The mere filing or handing of a dispossessory warrant to the clerk of the proper court in the cases to which this proceeding relates, if not preceded by anything done by the office-boy, would certainly not subject him to the charge of practicing law; but if the handing

of the paper to the proper clerk was necessarily preceded by acts which are confined exclusively within the franchise given to members of the legal profession, and then were followed by a series of acts which admittedly occurred during the progress of the litigation begun by swearing out the dispossessory warrant, in my opinion this would be practicing law within the inhibition of the Code, § 9-401. The practice of law is representing litigants in court, and the preparation of pleadings and other papers incident to any action or special proceeding in any court or other judicial body; conveyancing; the preparation of legal instruments of all kinds where a legal right is secured; the rendering of opinions as to the validity or invalidity of titles to real or personal property; the giving of any legal advice; and any action taken *for others* in any matter connected with the law. The question in this particular case turns upon the determination of what is litigation, and upon what is the exclusive function of the licensed lawyers of this State in all litigation in the courts of this State. It seems to me that the proceeding started by dispossessory warrant would be litigation. It certainly would be if the process were attacked on any ground; and should it be less litigation because it might happen to be settled or dismissed? "The purpose of all litigations is to preserve and enforce rights and secure compliance with the law of the State, either statute or common." Missouri &c. Ry. Co. *v.* Missouri R. Com., 183 U. S. 53, 60 (22 Sup. Ct. 18, 46 L. ed. 78).

The Code, § 61-401, among other things provides that "If the tenant shall fail to pay the rent due at any time, the landlord may re-enter immediately and dispossess the tenant." In § 61-402 provision is made, in case the landlord does not himself re-enter, for the issuance of a warrant and the manner of its execution, as follows: "Any person who may have rent due may, by himself, his agent or attorney, make application to any justice of the peace within the county where his debtor may reside or where his property may be found, and obtain from such justice a distress warrant for the sum claimed to be due for the said rent, on the oath of the principal, his agent or attorney, in writing, which may be levied by any constable, duly qualified, on any property belonging to said debtor, whether found on the premises or elsewhere, who shall advertise and sell the same, as in case of levy and sale under

execution: provided, if the sum claimed to be due shall exceed $100, . . it shall be his duty to deliver the warrant, with a return of the property levied upon, to the sheriff," etc. It is obvious that this speedy and drastic remedy is not granted except upon a written oath. Upon whose oath? The principal (the landlord), his agent or attorney. It is conceded that in the cases embraced in the stipulation the landlords were persons other than Sharp-Boylston Company. It is not claimed that any of the owners of the property made oaths in these cases. It is conceded that the defendant corporation is "his agent" referred to in the statute. It is not contended that in any of these transactions any one except Mr. Teepel made oath for the issuance of the distress warrants. The question then arises, whether the agent, Sharp-Boylston Company, is authorized by law to delegate to Mr. Teepel the right of doing its swearing, so as to authorize the agent of an agent, as proxy of Sharp-Boylston, to swear out distress warrants. Mr. Teepel is not an attorney at law. The statute authorizes the principal, his agent or attorney, to make such oath. Perhaps the language used in the Code section may be properly construed to refer to an attorney of the real-estate agent; but Mr. Teepel is not an attorney, and, as well set forth by the learned trial judge, the case is one of an agent of an agent making the oath required by law. In my opinion this is not permissible.

It was long ago decided by this court, in *Howard* v. *Dill*, 7 Ga. 52, that "One can not delegate the right to swear; one can not much more delegate the *obligation* to swear. The duty is one that refers to *his* mind and conscience. He may not swear by proxy." It is true that at the time of that decision the law did not contain a provision by which the oath in case of a distress warrant could be made by an agent, and for that reason if the oaths in the cases now sub judice had been made by one of the officers of the corporation, Sharp-Boylston Company, upon whom had been placed the responsibility and the obligation to swear, the oath would have been a valid oath. This is recognized; for the corporation, being an artificial person, can act only through human instrumentalities, a director, president, secretary, treasurer, or any other officer charged with the conduct of its entire business. To say the most, Teepel was a mere collector of rents. Judge Nisbet, in the *Howard* case, said: "The remedy given for the

collection of rent is rapid and summary. The legislature, no doubt, felt the necessity of protecting it from abuse—of· throwing around the tenant some safeguard—some guaranties against unfounded and vexatious suits for rent.. Hence they prescribe as a condition precedent, that the applicant for the warrant—the creditor [now 'or his agent']—should swear that the rent is due. Without this, the warrant can not legally issue. The safety of the tenant is found in the *oath* of the landlord and in the responsibilities which his oath imposes—in his liabilities to the pains and penalties of the law, if he swears falsely. This security is weakened—not to say lost—if the oath of an agent is held sufficient. His oath casts no responsibility upon his principal, and comparatively little upon himself.· He may believe the rent is due, when in fact it is not. The allowance of the oath of an agent in these cases would open a wide door to frauds and perjuries, and leave the tenant subject to oppression. This act and all others which give peculiar and summary remedies are to be construed strictly; and he who would avail himself of them must bring himself strictly within their requirements. It is said that what a man may lawfully himself do he may do by his agent. This is a rule of law; but it extends not to oaths—to acts which are strictly personal." This language is still applicable to the change in our multiform civilization which authorizes the direct agent of the landlord, who perhaps lives beyond the limits of the State or county where his property is situated, to swear in necessary cases instead of the landlord; but it did not contemplate that the only person in such instances qualified to assume the obligations of an oath, and the responsibility if he swore falsely, to shift from himself the responsibility to a subagent, perhaps entirely unknown to the owner of the property, but whom the agent may select as a rent gatherer, and permit him to delegate both the right and the obligation to swear.

The Code, § 9-402, declares that "It shall be unlawful for any person other than a duly licensed attorney at law to practice or appear as an attorney at law, for any person other than himself, in any court of this State or before any judicial body, or make it a business to practice as an attorney at law, . . or to render or furnish legal services or advice, . . or to render legal services of any kind in actions or proceedings of any nature, . . or

to furnish legal advice, services or counsel. . . It shall also be unlawful for any corporation, voluntary association, or company to do or perform any of the acts above recited." These acts are not embraced within the things permitted to agents of the landlord in distress-warrant proceedings under § 61-301. In the first division of this opinion I have attempted to point out the broad and necessary policy involved in keeping separate and distinct the prerogatives granted by the franchise to lawyers and to real-estate agents respectively. The acts of the plaintiffs in error—filing affidavits, making deposits of court costs, dismissal of proceedings where defendants made settlement, and giving instructions to the officers to enter the warrants settled, and the withdrawal of money paid into court—are not the functions of real-estate agents; and treated all together they constitute the practice of law, which has been exclusively reserved to those whom the courts have adjudged to be competent to deal with legal questions, and of such moral character as not to abuse their high position as officers of court. The admitted acts set out in the stipulation constitute representing litigants in court. The inhibitions of § 9-401 of the Code include the preparation of pleadings and other papers incident to any action or special proceeding. This section of the act would seem to have been complete had it merely said the "preparation of pleadings and other papers incident to any action;" but the legislature seems to have had in mind that there were a number of special proceedings which in some respects differed from ordinary actions, and so they added "special proceedings" to take in such as distress and dispossessory warrants and attachments, and various other special proceedings that might be mentioned. The affidavit which the agent prepares in a distress-warrant proceeding is in the nature of a pleading setting out facts which entitle the principal to the relief claimed. It is clear that the acts of the plaintiffs in error are within that portion of § 9-401, which includes within the definition of the term practice of law "any action taken for others in any matter connected with the law." Certainly, under the record in this case, it is plain that the plaintiffs in error have furnished legal services and rendered legal services of "any kind in actions or proceedings of any character," if the proceedings by distress warrant are authorized by law. "To distrain for rent involves the conduct of a highly technical proceeding under

the distress act, and to bring dispossessory proceedings up to the point of starting suit involves not only a proper construction of the lease, but also a knowledge of the landlord and tenant law." Unger *v.* Landlords' Management Corporation, supra, where the court quoted the language of Mr. Justice Hines in *Boykin* v. *Hopkins,* 174 *Ga.* 511 (162 S. E. 796). This language was adopted almost verbatim in the Code, § 9-401.

The Code, § 61-301, provides that where a tenant holds over after his term, or fails to pay the rent when due, and the owner desires possession of the premises, "such owner may, by himself, his agent, attorney in fact or attorney at law, demand the possession of the property so rented, leased, held, or occupied; and if the tenant shall refuse or omit to deliver possession when so demanded, the owner, his agent or attorney at law or attorney in fact may go before the judge of the superior court or any justice of the peace and *make oath to the facts.*" (Italics mine.) Section 61-302 provides that the officer before whom the affidavit is made shall issue a dispossessory warrant. The provisions quoted go only so far as to prescribe who may make oath to the facts, and before whom it may be made. It may be that the agent and not the landlord knows the facts. However, the permission that the agent may make the oath distinguishes distress warrants from others where the party only may make the prescribed oath. §§ 81-405, 81-406. The quoted provisions in terms permit the agent to "make oath to the facts." They go no further. For an agent of the landlord to "make oath to the facts" is a wholly different thing from the agent forming a legal judgment that the facts verified by him entitle his principal as a matter of law to eject the tenant. When the agent files the affidavit and makes the required deposit to cover court cost, he represents that legal grounds exist for the issuance of the warrant. He further instructs the court officer to issue the warrant. Later, when payment is made, he instructs the officer not to execute this warrant. These acts, dependent upon the exercise of judgment as to legal rights and remedies, are not within the scope of the duties of a messenger or ministerial agent. Non constat that because the Code section authorizes an agent to make "oath to the facts" he is authorized to set in motion the machinery of the law and direct it to a conclusion. That an agent knowing the facts may swear to them does

not rationally require the conclusion that such person may assert the legal rights of his principal in a judicial proceeding growing out of those facts. To make the affidavit is to act as a witness. To form a legal opinion upon the facts, instruct the court to issue the warrant, and thereafter to control the proceedings, is to furnish legal services as an attorney at law.

The questions involved in this case are of great importance, not only to the legal profession, but to all the people of the State, who are concerned in the proper administration of the law and the preservation of the rights of all, rich and poor alike, landlord and tenant alike. If the contention of the plaintiffs in error as to dispossessory warrants is correct, there would seem to be no reason why it would not be equally applicable to other proceedings which may be instituted upon affidavits made by agents. Included among those are attachments, garnishments, foreclosure of chattel mortgages, foreclosure of conditional-sale contracts, foreclosure of other liens on personalty, and bail-trover. These proceedings comprise a large part of the business of inferior courts; and if agents may act for litigants in these classes of cases, the business of such courts may largely be in the hands of lay persons without professional training or responsibility. Not only so, but in my opinion it would certainly encroach upon the franchise and consequent property right which I think inheres in the license granted to proper applicants to practice law in the courts.